Good morning, Your Honors. May it please the Court, this appeal presents the purely legal question of whether a single unforeseeable inmate on inmate assault can support the denial of qualified immunity and a Monell claim under 42 U.S.C. section 1983. The District Court answered those questions, yes, but that answer conflicts with settled precedent from the Supreme Court and from the Circuit. The District Court applied the Eighth Amendment to deny qualified immunity to Officers Berry and Linster, and then the Fourteenth Amendment to sustain the Monell liability claim against Sheriff Blackwood. Neither standard supports liability in this particular case. Under the Eighth Amendment's clearly established law, qualified immunity cannot be overcome without proof that both defendants Berry... Are you representing everybody, the individuals and the Sheriff? Okay. I represent all of the defendant appellants. Yes, sir. So under the Eighth Amendment's clearly established law, the qualified immunity question, qualified immunity cannot be overcome without proof that Berry and Linster were actually aware of a specific serious risk to Mr. King and chose to disregard it. And on the record, we do not have those facts. The Court, looking at those facts in the light most favorable to the nonmoving party, misapplied the law and found that it was... So is it your understanding that the harm at issue is the inmate beating, the asthma, or both? It's the serious medical need. Officers Berry and Linster recognized that serious medical need to be the asthma when Berry entered the cell. But the Court looked at it in the narrow sequence between the time that the last round had been done and then Berry entering the cell. And there was a 25-minute lapse there. But what the appellee... So let me just stop for a second because the rub that I've got here, you keep saying asthma. But the District Court found that they suspected that he had been assaulted. There was a statement after the fact? No, no, no. I'm talking about what... Because we have the challenge that we don't get to review those factual findings. Correct. Right? We... The nature of the posture here in a locutory appeal is that we have to accept the findings. And it seems like the District Court made an actual finding that they suspected that he had been assaulted. And so I guess help me understand why I don't have to accept that fact. Right? With respect to the knowledge that they had, you know, 24 minutes or 20 minutes before they went into the cell, I take the District Court, and I might not agree with it, but it doesn't matter. Don't I have to take as a given that they suspected that he had been assaulted? Yes, Your Honor. There was sufficient evidence from which a jury could conclude that he was assaulted. That is what the District Court concluded, and we are bound by the facts that were conclusively found below. The error is in the legal standard was applied because it was not clearly established in 2020, at the time that Barry and Linster were involved in this incident, that Mr. King was entitled to thorough security round checks. What about the medical necessity, though? I mean, because the District Court looks at it. I know you're trying to lump them together, but she looks at the safety, and then she looks at the health and safety and the medical need. Well, the court granted summary judgment as to the failure to protect claims. So on the serious medical need, the medical need that the officers perceived was an asthma attack. So as far as any other serious medical need, not even that. At what time do you think that was? So when did they recognize that? After they went in the cell? After they went in the cell, but there was at least the suspicion before entering the cell that it was asthma, and that was why Barry was not entailed. No, no, no, you've just agreed. The District Court found that they believed he had been attacked. The medical need was he'd just gotten whipped. Right? Like that's a – I mean, if you're in prison and you believe that somebody has just gotten beaten up, isn't that a medical need? Well, actually, what the summary judgment order says is that there was a statement the next day that there was a suspicion about whether Barry went in and was looking for any injuries and didn't want to blame anyone for anything that hadn't been done. I totally agree. That's a great jury argument. I'm totally with you, but the District Court – She found that they suspected an assault. Right. They suspected that he had been assaulted. Suspected means like it's knowledge, right? It means a suspicion. Right. They suspected he had been assaulted, so it's not about asthma. The risk here, the risk they suspected was that he had been beaten with asthma, so maybe that makes it worse. Well, we're not talking about a suspicion. What Farmer v. Brennan talks about is a subjective awareness of a risk of harm and disregarding that risk. That is not what – And if you believe that somebody's been beaten in their cell, you think that's not knowledge of a risk of harm? No. What I'm saying is that their response to what was seen in the cell, whether the court would like to say it was asthma, whether it was suspicion of a beating, their response was to obtain medical care. Yeah, but that's a different argument, right? So the first argument is what did they know, and then we can talk about whether their response was a reasonable one, right? I totally get that, but they had knowledge of a substantial risk. They suspect he had been beaten. I don't read the District Court's order to say that the officers had a subjective awareness that the serious medical need was related. They suspected he had been assaulted, and there's more than enough evidence to find that they had subjective knowledge of Mr. King's serious medical need. I mean, those are just the words. I'm just reading, right? I might not agree with it, right, if I was looking at the record as a juror, but I've got to accept that, don't I? You have to accept the facts, and our argument is that the law as applied to those facts is where the District Court erred. Do you think that Berry and Lindster's subjective knowledge, is that a fact? Their subjective knowledge to the extent that the court said that they suspected an assault. No, no, I'm asking a different question. Is their subjective knowledge a fact, or is it a legal conclusion? Their subjective knowledge would be a fact. So where the court erred was in the application of the subjective awareness because there has to be that subjective awareness, but there also has to be a conscious disregard of it. So the court below also looked at the fact that Berry went to get the inhaler before he went to the cell. The fact that when he goes to get the inhaler and he goes back to the control room and he waits, because this whole thing about when he's supposed to be going to do his checks, and he sits there waiting. He's on the video looking at his watch. How is that not subjective knowledge? It's not relevant to the question of what he knew before he entered the cell. What they knew is that there were ambiguous noises. Is that because getting the inhaler goes to, and I'm asking this as a question, getting the inhaler goes to a suspicion he might have some asthma problem as opposed to that he'd also been beaten? Correct. That was the ambiguous noise that they heard over the intercom, and Berry's first suspicion, as evidenced by the fact that he went to the nurse's station to get the inhaler, the first suspicion is that an inmate with a known history of asthma was having an issue with asthma. A medical need. Yes, the medical need was asthma. That was his, if we're taking it as this was what he knew, there's a reasonable inference to be drawn. The reasonable inference that he drew is that an inmate who had a known history of asthma was having an issue with asthma. But that's just flatly inconsistent with what the district court finds. I totally get that argument to a jury, that the jury should infer that his mental state was about asthma because of what he did. I totally get that argument. That is not what the district court found. But the legal question for this court is about the subjective knowledge. No, no, no, no. You just admitted subjective knowledge is a fact question, not a legal question. Farmer versus Brennan says that there has to be subjective knowledge of the risk and a conscious disregard of it. That's the Supreme Court precedent. Right, but Judge Richardson has read this to you from the district court's opinion. Again, we might think that they're wrong, but there's been a determination that a jury could find as fact that they knew, that the two guards knew, that this individual, Mr. King, had been beaten. So we have to start with that premise. We can't change that on summary judgment review here when we're talking about a qualified immunity issue. With that as a given, then what is the law that applies in that circumstance that gives your clients a protection? The question is twofold. If we accept the district court's finding that there was a subjective awareness that Mr. King may have been assaulted, the second question is, was there a conscious disregard of the risk? And what's clear on the record is that there was not. Whether or not Barry and Linster thought it was asthma, we can put that aside, and we can look at what was the response to what they perceived at the time. And so on that question, you have to agree, I assume, that they, quote, delayed checking on Mr. King for some 20 minutes in order to avoid extra paperwork. So that their mental state was, we know he's been beaten, but we're going to not go check on him now, because if we go check on him, we're going to have to fill out a report. And that's, like, just a pain in the rear. And that's, like, a totally legitimate answer. And I do want to be clear that it was not paperwork related to whether he had been assaulted. It was paperwork related to the round check. I think that that is an important distinction to make here. And the district court did say that. It was related to paperwork related to missing the round. But accepting all of those facts. I'm not sure that's any better. Is that better or worse? That sounds worse. I actually think it's worse. Well, either way, the record is that they didn't want to do the extra paperwork related to the missed round, if there would be extra paperwork. They knew they were going to have to do paperwork about him getting beaten up. Right? They already knew that. They had to do the paperwork because they knew he'd been beaten up. They're not going to be able to not do a write-up about him being beaten. The question is, are they going to have to do another report about why he was beaten up? Well, that's certainly not something that the district court addressed in the order related to that question. But getting to the question of what their response was, their response was, first of all, there's no precedent in this court saying that the 25-minute delay results in a constitutional violation. So that's first. Second, I do want to. Well, I'll start with this premise. We're just going to assume that I'm staying away from the jury arguments, which could be very good. Everything with regard to asthma was fine. But then if the jury found that they knew he'd been beaten but their only response was related to the asthma, that would seem to indicate they made no response to the beating. Well, the inhaler response would be to the asthma, but the response was also, after seeing him in the cell, was to consult the on-site nurse, to also contact the supervisor. I think the point would be the time period they're looking at is from the time they heard noises or worried about having to do the extra reports up until the time they actually went in and called for the nurse. That is the time that the district court limited the review to, is that pre-entry time period, which is a 25-minute time period. So I would go back to the point that there's no precedent in this court that would establish that that 25-minute delay establishes a constitutional violation to Mr. King or that there was a clearly established right, as I expect the appellee to press, as to the thoroughness of the security rounds. So what would happen if you're changing the facts? You've got a 25-minute period. But what happens if, during that 25-minute period, they saw a blood trail coming out of the cell and didn't do anything about it? You can't argue that 25 minutes is a per se limit, can you? No, you can't. If there were a blood trail coming out, that would be a very different case. Those aren't the facts before us, but that would potentially be a different case because you would have reason to know that someone is inside the cell bleeding. That certainly was not the case here. The suspicion that someone had been beaten does not speak to what the severity of that beating was, and I do realize that that speaks to the fact that possibly it could have been a better course of action to go in sooner. I completely appreciate that and accept it. But on these facts, the issue is what was clearly established in 2020, and I do just want to very quickly get to the point. Let me ask you this. Don't they hear him moaning and groaning or whatever during their checks, and they don't even go in at that point, right? There was some discrepancy in the record as to whether it was a moan, a groan. They hear something. They hear a noise, and then they go and listen to it on the intercom as well. But they don't, even though they're there, they don't even go in at that point. And they go back, they listen to it on the intercom, then he goes to get the inhaler. That's correct. And then they come back and intentionally wait for the 20-whatever minutes because they don't want to do the extra paperwork. That is the factual sequence that we had in the court below.  All right. Well, counsel, you're over, but why don't you take a minute or so to move to the sheriff. And there's a pending motion to dismiss that appeal turning on the appellate jurisdiction question. Give us just a brief overview of what your position is. That this court can exercise pendant jurisdiction because the issues are inextricably intertwined between the qualified immunity question on the serious medical need and then also the Monell claim. That is based on our reliance on persuasive authority from the Eighth Circuit that states that if a right, that you can't be deliberately indifferent to a right that is not clearly established. So the argument being that under Monell, Sheriff Blackwood cannot be liable if the officers would not be liable based on the lack of a clearly established right. And one of the points I wanted to- Right. But the qualified immunity here would apply to this known risk during that short period of time, which really doesn't relate to the Riley issue of, well, they made defective checks. So the claim here, as I understand it on the Monell side, is that there's a pattern in practice of doing this poorly. So that evidence would be different regardless of what the qualified immunity issue was with regard to the individual defendants. I don't think it's different to the extent that the argument about qualified immunity hinges on the fact that the check should have been done sooner or there should have been better quality checks. And that pre-entry, that better quality checks going sooner, would have obviated the harm here. So in that sense, they are related from the pre-entry window to what the plaintiff appellee says caused the customer policy that caused the harm to Mr. King. All right. Thank you very much. You've got some rebuttal time. Ms. Sharp will now hear from you. Thank you very much. Thank you, Your Honors. May it please the Court. This appeal is before this Court under the Collateral Order Doctrine, which allows Detention Officers Berry and Linster an interlocutory appeal of the District Court's determination that the evidence viewed in the light most favorable to the plaintiff leaves questions for the jury, which must be resolved in order to decide whether or not Berry and Linster are entitled to qualified immunity. That is why we're here. That is the only issue that is properly before this Court. The purpose of qualified immunity, of course, is to protect public officials from undue interference with the exercise of their official duties. Sorry, not that I'm not interested in the purpose of qualified immunity, but I sort of got that part. Can you talk to me? I sort of see three different allegations of deliberate indifference here, and we've really focused primarily on the middle one, which is the delay from noise to entry. Right. And sort of bracket that one for a minute. I sort of understand that one, I believe. But it seems like you've also made two separate arguments. One is with respect to the checks, the failure to check inside the cell. And then second, with respect to the nature of the response after they entered the cell, right, that there are these three different sets of conduct. And I guess I'm having a very much understand your middle, you might imagine from the questions, I might understand this middle piece. What I don't understand is the first and the third after Riley. Can you help me understand what we do given Riley with respect to the failure to look in the cells and the adequacy of the response? Yes. And I would say this isn't about three separate claims. This is about a claim of non-supervision amounting to deliberate indifference that spans over the course of their shift. Yeah, but you don't get to do that, right? You don't get to just say we put all of these things in a pot and it comes out. We have to look at the action and inactions as they are. Correct. We don't sort of do a big old pot and say in general it's bad. We've got to look at the specific actions. That's correct. And in response to the limitation of the 25-minute limitation, what appellant's counsel just said was that the court limited this to the 25-minute delay, which is not accurate if you look at page 8. No, no, but assume for a minute that I'm about to limit it to the 25 minutes. Tell me why that would be wrong.  To distinguish this case from King v. Riley, Your Honor, first of all the fact that one of Berries and Linster's acts or omissions of deliberate indifference is passing by Mr. King's cell without looking in happens to be the only issue in King v. Riley does not make this case King v. Riley. There's a lot more acts and omissions of deliberate indifference in this case. Right, but what you can't say that failing to look in was deliberate indifference. It might be pertinent to the 25 minutes from an evidentiary perspective, but what a jury could not find or a court could not find is that the failure to look in the cells itself was an act of deliberate indifference. The deliberate indifference on the rounds is not specifically that they're failing to look in the cells. The purpose of looking into the cell is visual inspection, which is required by their policy, their policy manual. Same in Riley. Well, I don't know that there were policies that were violated. There were policies in Riley. Okay, so there's this policy manual that also requires responding to suspicious conduct that occurs either while you're conducting rounds or when you're in the control room. They weren't responding to any of the suspicious conduct. That might be pertinent in the Monell discussion, but are you making a stand-alone claim that this failure to observe in the cells is deliberate indifference in and of itself? No, Your Honor. All right, so that's gone. That's not the stand-alone claim. Well, let me ask you this. Because I know Riley is not going in the cells when you're supposed to go in, and Riley says that's not deliberate indifference, but what about not entering the cell after hearing the moaning and groaning or whatever it is? She said it was noise. Sure, but I think that gets us back to Judge Richardson's point, which is the 25-minute delay. And what I'm trying to do for the court is expand that and explain why this is all deliberate indifference. The way that they describe, for example, Berry and Linster. Right, but again, that may be part of your evidence, but if a jury came back with a decision on the deliberate indifference is limited to the failure to look in before the 25-minute starts, that's barred by Riley. Right, but we are not talking just about failure to look into the cells. There's a lot more to their rounds. Right, but that puts you back in the 25 minutes at that point. No, Your Honor, if I may. When they're conducting what they're calling punches, they don't call them rounds. They call them punches. They acknowledge that the purpose of them going into the cells, it's not to conduct a supervision round. Berry and Linster both testified that they went into the cell to do their punches. Well, they went into the pod. To the pod, correct. They don't go into the individual cells. They go into the pod to do their punches. Berry described it. He said, we only go in single just to punch. Linster, when he was deposed, I asked him, is that your definition of a round to do your punches? And he said, yeah, that's what it means to do a round, to punch. That is that you can watch the videos and you can see that that is all they are focused on is reaching those wall sensors with their electronic device and falsely documenting that they have conducted a security round, a supervision round, when they have not. Their job is to put eyes. So you think that distinguishes you from Riley? That's the reason you think that Riley is inapplicable is that, or is there something else? Riley said, Riley held, that it was not clearly established law that to look into the cell on supervision rounds was deliberate indifference. Here we have officers who are knowingly not doing their jobs. They are knowingly violating multiple policies. They're not responding to suspicious conduct when they're in the pod. And so we don't spend all our time on this. Are you making a stand-alone claim for the period prior to the 25 minutes based on these failures and going through the pod? No, Your Honor. It's also their behavior in. . . Okay, so why don't we just assume that that's out? But wait, she's not agreeing that it's out. What she's saying is we've got to put all this in one big pod and we just sort of call it all deliberate indifference rather than looking at it conduct by conduct. There is suspicious conduct that occurs in front of Berry and Linster when they're in the pod conducting their punches, their rounds, their punches. So you're saying that's deliberate indifference? Absolutely, because this is also in their policy manual. They know that one of the jobs that they're required to do is to respond to suspicious conduct of detainees. Linster acknowledged in his deposition that he recognized at the time the suspicious conduct in front of him by detainee Bradford and then misrepresented that he responded to that conduct, which is an acknowledgment not only that he was aware of the risk at the time that Mr. King had been assaulted, but it's also an acknowledgment that he knew he had failed to respond appropriately to that risk. He's misrepresenting that he responded. So did the district court make any determination that what you just described is part of the evidence upon which a jury could reach a verdict for the deficiency, the alleged deficiency, during the 25-minute period? The court states that there's a genuine dispute as the officer's subjective knowledge and that there's evidence from which a jury could infer that the officers knew they were violating Mr. King's rights and if a jury resolves that factual dispute to conclude that Berry and Linster ignored obvious risks to Mr. King's health for over an hour before the 25 minutes and then, upon realizing that he was in urgent need of medical care, continued to ignore him for another 20 minutes to avoid extra paperwork, that would be an obvious constitutional violation. So yes, she is also acknowledging the acts and omissions leading up to that 25 minutes. The 25-minute delay, that is possibly the most egregious piece of evidence in this case, that even after they heard, and it was labored breathing to your question, Judge Benjamin, it was labored breathing that Officer Linster heard when he walked past Mr. King's cell. And what did he do? He continued walking. He walked right past it, knowing he hadn't looked in, knowing they had not checked on Mr. King for over an hour. All right, let's just, we can come back to this if you want to, but let's assume that, just for purposes of argument, that the period prior to the start of the 25 minutes is out. All right? So now skip over the 25 minutes and go to Judge Richardson's third bucket, which is the response. So obviously we want you to come back to the 25 minutes. Why is the response deficient? The response is deficient because when Barry walks into King's cell, he spends about four minutes in King's cell with him, and then he leaves. And you can see on the video that at first he starts to exit the pod, and then he turns around and he goes and does his punches. Instead of leaving the pod and getting Mr. King help, he's very much focused still. So the four minutes was with the inhaler. Correct. So he entered Mr. King's cell with the inhaler in his hand. He obtained that from the nurse's station before even entering King's cell, even entering King's cell suspecting that Mr. King had been assaulted. He's going in. He tells investigators he's going in looking for signs of assault. Linster made a similar statement to Barry. Before you go in, he's telling Barry to look for signs of assault. So this idea that they thought it was asthma is, frankly, it's false. They believed Mr. King had been assaulted. They believed he was suffering an injury from assault. Barry goes into the King. Well, the two are mutually exclusive. I mean, it may not make a difference verdict-wise. That's true. But I don't think that there's anything in the record that says that they didn't suspect asthma, but that may not be particularly relevant to the beating part of it. Correct, Your Honor. Well, if you were going to somebody who had been beaten who had asthma, you would also imagine they got an asthma problem. I mean, I don't understand. You just said it's false. That seems, like, wrong. Like, it seems like to me if I knew somebody had been beaten who had asthma, I would assume that they have an asthma problem because they've just been beaten, and they probably also have a contusion problem because they've just been beaten. Let me rephrase. The argument there claimed that the only reason, the only thing they suspected, was that this was an asthma attack is false. And if you walk into a cell with holding an asthma inhaler and you believe that you're helping someone because you – Well, from your standpoint, not to put too fine a point on it, it's false in the sense that a jury could conclude that. Correct. Not that they will, but that they could. Correct. And this – Can you go back to the third bucket and just give me your –  I know you've got a lot on this second bucket, and we could talk about it a lot. But tell me why on the third bucket in light of Riley, because in Riley we sort of say you ain't got to be perfect. You can continue to do your job in other ways. Like, other things happen, right? Like, this is not a demand of, like, perfect efficiency. I do think it's important to that point, though, to note that both Barry and Linster had been previously corrected or attempted to be corrected by their previous supervisor, Sergeant Witted, who repeatedly told them – Why would that possibly matter? I don't understand why that would possibly matter. Because it goes to knowledge that they're violating – That they're not being efficient, right? No, not being efficient, that they're not inspecting the detainees. And why do we want them to inspect the detainees? To make sure that everybody is safe, to make sure that everybody is protected. But we're talking about the third bucket. They already know he's been hurt. I don't understand how that has anything to do with the third bucket. I'm happy for you not to answer, but I'm just trying to get your answer with respect to the third bucket. Yes, Your Honor. And whether they did inspections at time one simply is – I don't understand why that would be plausibly relevant to time three. When Barry enters Mr. King's cell, he finds Mr. King sweating profusely, unable to walk, wincing in pain upon any movement. He has a contusion, a fresh cut above his eye, and he's having difficulty breathing. Barry leaves the cell, and again, instead of leaving the pod, he goes and finishes his punches. He goes to the control room, and at some point a nurse is called. He tries to call a nurse according to his report. She doesn't answer. Barry and Linster then take 10 minutes. They wait 10 minutes before going back to Mr. King's cell. They leave the door wide open, suspecting he's been assaulted by someone in B-Pod. They go back to King's cell with another detention officer, Gomez, and then they take, between the altercation and the assault on Mr. King and the time they exit B-Pod with Mr. King, it's two hours and 17 minutes. Two hours and 17 minutes between those two times. They take time to dress him. So your answer is, like, you can't just address the third bucket. Your view is that, like, they have to be put into a big cauldron and sort of mixed together. No, Your Honor. Right, because the two hours is obviously before even time one bucket, right? Like, that's when he's assaulted, which is before they went around, which is before they waited 25 minutes, which is way before the bucket we're trying to talk about. But your distinction is that it is. It's one hour and eight minutes, Your Honor, between the time they hear the labored breathing and the time they take Mr. King out of B-Pod. It's one hour and eight minutes. So the distinction between the start of the second bucket and the end of the third bucket is what you're ñ that's the time period you want me to focus on. One hour and ten minutes. The start of the second bucket to the end of the third bucket. I'm happy to focus on that. I'm just trying ñ I want to make sure I understand your argument. Because you've already said, you know, you understand the 25 minutes, then I'm just saying that that additional time, we're talking a total of one hour and eight minutes. That's the start of the 25 minutes until what? Until Mr. King is finally taken out of B-Pod. The policy tells the detention officers that when they find someone in a medical emergency, they are required to evacuate the pod and call EMS. They did not do that in this case. They recognized ñ both Barry and Linster admitted in deposition that they recognized this was a medical emergency. When they were asked why they did not call EMS, neither of them ñ they gave various answers. One was, that's really not our job. But they did report it to a supervisor, and they did get in touch with the nurse, and they were taking steps, whether it's changing his clothes, getting a wheelchair. All of that could well be negligence. But negligence is not deliberate indifference. So why is this response, starting at the time that one of them goes into cell and actually observes him until they depart the pod, why is that part deliberate indifference? Because having acknowledged in deposition that they recognized there was a medical emergency, they instead treat this as if it's a routine trip to the nurse. There is absolutely no urgency. There is absolutely no effort to call for EMS to make sure that his emergency medical needs are met. They are slow walking it, Your Honor. They take time to put him in a fresh jail jumpsuit. Why? Why wouldn't you just immediately get this man to a hospital? And the appellant's brief focuses ñ But again, why is that deliberate indifference as opposed to negligence? Maybe even gross negligence, but that still doesn't get you to deliberate indifference. Well, I think that it goes to ñ to answer that, we have to look at what their mental state was, because that's what deliberate indifference is really about. And that's why it's important to consider all of the evidence in this case, because ñ Right, but it's two steps, okay? We've already gone through their state of mind, all right? First step. And the second step is, well, what did they do about it? And they slow walked it, Your Honor. They treated this as if it was a routine trip to a nurse. Because they don't ñ I mean, based on the timeline, they don't call EMS until 9.06. They go in at, what, 8.13? That's correct, Your Honor. That's correct. And it was the nurse who called EMS, pretty much immediately upon seeing Mr. King. And I suspect my colleague here is going to argue that, you know, even the EMS workers didn't know this was a medical emergency when they saw him. But that's actually not true. Based on their declarations, they were very concerned about Mr. King. They said it looked like he may have suffered a cardiac event. They immediately did a 12-lead and took him to the hospital. The nurse, as soon as she saw him, she said he was in and out of consciousness, he was unable to walk, he had this fresh contusion above his eye, and she immediately dialed 911. But, again, Berry and Linster both acknowledged in deposition that they believed Mr. King was suffering a medical emergency. And they failed to respond appropriately to that. They didn't respond at all. They didn't respond in line with the emergency medical plan. Well, why do you say they didn't respond at all? I mean, it may have been woefully deficient, but they were taking actions all through that period. It may have been wrong, it may have been negligent. But to cross that line to deliberate indifference would seem to take something more than just, well, they chose the wrong steps. They chose to ignore his emergency medical needs and take him to the jail nurse as if this was a routine medical visit. They waited 43 minutes before they called EMS. And wait 43 minutes with that. And, again, they did not call EMS, which was their job, according to the policy. Right, because they contacted the nurse. Well, the policy manual. And then the nurse is the one that elevates it. I mean, listen, maybe you think that's, like, not a good thing to do, but I don't know, if somebody looks like they're hurt and I get a nurse, it's a little hard for me to think, like, actually, I'm going to need to overrule the nurse here. I think we need to do something different than what the nurse is suggesting or doing. Well, it's not just that I think it's not the right thing to do, Your Honor. It's from Short v. Hartman, page 613, which tells us, though a violation of a local policy does not by itself violate the Constitution or give rise to a Section 1983 claim, it is nevertheless instructive both in determining the seriousness of the risk posed and in determining whether an officer knew of the excessive risk posed by the official's action or inaction. There are a number of policy violations in this case, Your Honor, that did not exist. What is the policy that says when you find someone injured, you are not supposed to contact the nurse but somebody else? Where am I looking at that? I see my time is up. May I answer? I'm sure you can answer. Go ahead. Go ahead. Thank you. The policy is the medical emergency plan, Your Honor. So you've got to know it's an emergency. But where am I looking at? Just give me the JA. All I'm looking for is the site. I can read it. That's all right. I can find it. More directly, my clerk can find it. You can send that to us on the 28th. I will send it to you, Your Honors. And the difficulty breathing was actually listed on that emergency medical plan as a sign and symptom of a medical emergency for which the detention officers were required to call EMS. All right. Before you sit down, same thing we ask of opposing counsel. Take a minute to tell us about the Minnell claim. Yes, Your Honor. Your Honor, opposing counsel acknowledged in her argument that the district court applied the Eighth Amendment to deny qualified immunity to Barry and Lemster. And that's exactly right. And so for that reason, the Minnell claim is in no way inextricably intertwined with the evaluation of qualified immunity. Qualified immunity was evaluated clearly by the district court, despite appellant's brief suggesting otherwise, was evaluated under Eighth Amendment standards. And the Minnell claim was evaluated under Fourteenth Amendment standards. So they do not depend on each other in any way. You can't appeal a Minnell claim until there's a final judgment. We're here on qualified immunity only, and it is not connected at all to that Minnell claim because we're looking at completely different standards because that's what the district court did. To understand that, can you tell me what is the Minnell policy? What is the policy or practice that you're alleging? It's a custom and practice of non-supervision, Your Honor. What do you mean by non-supervision? A complete lack of supervision. Supervision can happen two different ways, right? Of officers or of detainees? Supervision by the officers of the detainees. So failure to conduct any meaningful supervision rounds, only being focused on doing your punches, not watching from the control room. You think that was the policy that the sheriff had knowledge of? Absolutely, and there is evidence from Sheriff Blackwood's deposition testimony that he was aware that his officers were actually not visually inspecting the detainees just, I think, six weeks before Mr. King was assaulted, and that awareness came from jail inspectors' reports that notified him of these deficiencies, that his officers were being found not to be visually inspecting the detainees on their rounds repeatedly. I think there were six notifications that he was given. So your view, if I can go to what I perceive to be the bottom line, is that even if the individual defendants prevailed on qualified immunity, the issues with respect to the Monell claim are different and not determined by the qualified immunity finding. That's correct. And with regard to the 8th v. 14th Amendment issue, because I know appellants tried to argue that the district court relied on 14th Amendment standards in the qualified immunity analysis, which is not accurate according to her order, and so they used that to try to argue that the 14th Amendment standards are inappropriate here. And I do just want to say that that is not an issue that's properly before this court. It would expand the collateral order doctrine. But if and when that issue does reach this court, I believe that the 14th Amendment standard is appropriate, which is what both the magistrate judge and the district court judge found in this case. And the reason for that is that at the time of conviction, there was a Tenth Circuit case, the city of Muskogee, that found that at the time of conviction the state acquires the power to punish, and that is incorrect. That's simply incorrect. The state does not acquire the power to punish until sentencing, because that's when the sentence has been determined.  I think we've got the gist of that. So thank you very much. Thank you, Your Honor. And we'll turn to Mr. Castro. Are you the one who's going to do rebuttal? Yes, sir. All right. Come on up. Thank you, Your Honor. I wanted to begin by responding to the first batch, as we were calling it, of the facts regarding the nonsupervision, which are undisputably analogous to King v. Riley. I believe at worst, at minimum, the court should disregard the facts regarding the rounds that were conducted prior to the assault, all of the time period prior to them hearing a sound or being heard. What about Barry's testimony that he suspected that there was an assault occurring during his rounds? Isn't that different than Riley? Riley was just more of a we didn't look in, we did our rounds, we just didn't look in. I'm not sure that was what he testified as to. I believe he was referring to the point where they heard the moaning when Linster was coming back from his second round, where they heard moaning or labored breathing at that time was when they were discussing whether there could have been an assault. I'm not sure there was a suspicion or any testimony as to a suspicion during those rounds that he suspected an assault. The video demonstrates that the inmates were standing in front of the cell, concealing their actions, pointing the detention officers away from the cell. The period that occurs prior to them, Linster hearing a labored breathing, is fully dependent on plaintiff's arguments about they were standing around in the control room, not looking at the cameras. What about the Bragford point? Your colleague says that one of the two guys, I can't remember which, was suspicious about Bragford on the rounds, and that was before the concerning noise. It's gotten a different name in a lot of places, but I think the district court refers to it as a concerning noise. This concern from my reading, and I believe this is accurately reflected in the record, is that Garance was a dangerous inmate. That is undisputed. He had a past history of assaults. However, there was no, at the time of the rounds, there was no suspicion that an assault had occurred. The general knowledge of his dangerous predisposition, perhaps, is insufficient to rise to actual knowledge or subjective knowledge under Farm Review Brennan under the failure to protect dichotomy. The courts have continuously stated that there must be a specific inference made that that specific inmate poses a risk to King. Garance did have a past of assaultive behavior, but that is not, Linster, I do not believe that he testified that during his rounds he suspected that an assault had occurred at that time. It was generally the fact that Garance was a problem inmate, if that can be a term. Regarding the response, as was noted during opposing counsel's argument, the detention officers relied on the nurse. It was 8.10 p.m. when they first entered the cell after the labored breathing, after they heard the sounds. It was 8.24, 14 minutes later, when a wheelchair arrived. They called for the nurse, they called for a wheelchair, and it was 8.53, about 43 minutes later, where he was carried out to the nurse's station. So how much time elapsed between the entry to the cell and the call to the nurse? That is unclear, but at minimum it would have been in the range of 15 minutes because that is a moment where the record reflects that a call was made to the nurse and the wheelchair arrived according to the timeline, the undisputed timeline. It was around the 8.24 to 8.30 mark when the nurse would have been called, and thereafter the wheelchair arrived around that same time. He was carted out to the nurse's station, and courts have continuously stated that detention officers are entitled to rely on medical personnel in responding to a medical emergency, which is what they were doing. Therefore, we believe the response— Does the record show when the nurse actually arrived? Regarding the nurse—yes, the record does show that. Did the nurse actually go into the pod, or was it the entrance to the pod? The nurse is shown at 8.45 entering the hallway with Barry. She's not part of the actual direct participation in the response. That is all occurring after the nurse is initially called, which there's no record of specifically when that occurred. I wanted to briefly, since my time is running out, go to the— So when's the first time that you see the nurse? We see the nurse on camera with Barry at 8.45. This is after the testimony that the nurse was called, the wheelchair was rolled out. As I noted, they heard the breathing at 8.10, and they arrived with the wheelchair 14 minutes later at 8.24, and then the nurse eventually calls EMS. They were entitled to rely on the nurse's opinions as to the medical emergency. Going briefly to the Monell claim, King was not a pretrial detainee, and he was not entitled to the 14th Amendment analysis. Therefore, if the court is to analyze this case under the 8th Amendment applicable to the individual defendants, then it is directly intertwined with the Monell claim. He was a post-plea, pre-sentence prisoner, and the Supreme Court of the United States has clearly stated that a plea is a conviction, and once someone is convicted, they are entitled to the concept of punishment under the 8th Amendment. Tell me why, as a factual matter, what is the factual intertwining that is necessary here? Because, you know, one's about a policy, right? You can have qualified immunity, and the Monell claims still apply. They're not, like, mutually exclusive. If you get qualified immunity, hypothetically, that doesn't mean the Monell claim goes away or vice versa? It does not necessarily mean that. However, there are two prongs to the qualified immunity analysis. As Your Honor mentioned, if you're ruling simply on the clearly established prong, that there was no clearly established violation, there is a chance that the sheriff's claim can proceed, albeit it should proceed under the 8th Amendment, we believe. However, if the court is to rule that there was no underlying constitutional violation under the secondary saucier prong, then the sheriff's claim must necessarily fail because a Monell claim cannot proceed absent an underlying constitutional violation by an individual. That is why— So you agree, if we were to find, hypothetically, that there is some constitutional violation by these two defendants with respect to the plaintiff, then we would not then address the Monell claim? You should address the Monell. You would not be required to if it was under the clearly established prong of the qualified immunity. No, no. But what I said is if we find there was a constitutional violation by the two defendants, then we should not then address the Monell claim because there wouldn't be an inconsistency there. There would not be an inconsistency, but there would still be a legal error by the district court in the application of the 14th Amendment, however, which should be clarified on appeal, but there wouldn't be an inconsistency. There would be a legal error. Tell me that one more time, and then I'll stop. The legal error would be applying the 14th Amendment. In your hypothetical, if you were to find— Because you think the 8th Amendment starts to apply before someone is sentenced? Correct. I understand. Thank you very much. That's the only difference. All right. Thank you very much. We appreciate the argument of all counsel in this case. Thank you. And we're going to come down and greet counsel, but ask the clerk if she'll adjourn us for the day.
judges: G. Steven Agee, Julius N. Richardson, DeAndrea Gist Benjamin